U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2022 FEB 25 PM 5:00

CLERK
BY _____
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Case No. 2:21-cr-00064 |
| ) | |
| ADDIEL SANTINI, ) | |
| ) | |
| Defendant. ) | |

## OPINION AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE AND STATEMENTS
(Doc. 27)

Pending before the court is Defendant Addiel Santini's motion to suppress physical evidence and statements obtained as a result of the search of an apartment at which he was an overnight guest. (Doc. 27.) On December 21, 2021, the court held an evidentiary hearing at which Lyndonville Police Department ("LPD") Chief Jack Harris, Elia Spates, Douglas Spates, and Kevin Ridgley testified. The government submitted a post-hearing memorandum on January 18, 2022, and Defendant submitted a post-hearing memorandum on January 19, 2022, at which point the court took the pending motion under advisement.

Defendant was indicted on July 15, 2021 on a single count of knowingly and intentionally possessing with intent to distribute cocaine, cocaine base, and a mixture and substance containing a detectable amount of fentanyl, all Schedule II controlled substances, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C).

The government is represented by Assistant United States Attorneys Kimberly G. Ang and Michael P. Drescher. Defendant is represented by Assistant Federal Public Defender Steven L. Barth.

I. **Findings of Fact.**

Based upon the preponderance of evidence, the court makes the following findings of fact.

### A. The Lease.

On November 16, 2020, Thomas Deneen signed a three-page written Security Agreement & Rental Agreement (the "Lease") with Memphremagog Rentals, LLC ("MR") for an apartment located at 67 Center Street, Apartment D, in Lyndonville, Vermont (the "Apartment"). The Lease required payment of a monthly rent of $725 and contained the following provision regarding the Apartment's authorized occupants:

> **ONLY THE PERSON(S) LISTED:**
>
> Tom Deneen
>
> **SHALL BE CONSIDERED AS TENANT(S) HEREUNDER, NO ONE ELSE SHALL RESIDE AT SAID PREMISES UNLESS PRIOR WRITTEN APPROVAL IS RECEIVED. UPON SUCH APPROVAL, THERE WILL BE AN EXTRA CHARGE TO BE DETERMINED AT THE TIME OF APPROVAL. SUBLETTING OF ANY KIND IS NOT PERMITTED.**

Gov't Ex. 1 at 1 (emphasis in original). The Lease Agreement further provided that: "CRIMINAL ACTIVITY, ILLEGAL DRUG ACTIVITY, OR ACTS OF VIOLENCE ANY OF WHICH THREATEN THE HEALTH OR SAFETY OF OTHER RESIDENTS ARE GROUNDS FOR IMMEDIATE EVICTION." *Id.* at 3. It authorized the Owner to bar certain visitors to the property: "**THE OWNER MAY BAR SPECIFIC INDIVIUDALS FROM COMING ONTO THE PROPERTY. WRITTEN NOTIFICATION WILL BE GIVEN TO THE TENANT IF SUCH OCCASION SHOULD OCCUR.**" *Id.* at 2 (emphasis in original).

In conjunction with the Lease, Mr. Deneen paid a security deposit, his last month's rent, and prorated rent for November 2020.

### B. Mr. Deneen's Breach of the Lease.

Although Mr. Deneen paid rent in November and December, he did not pay rent thereafter. In January 2021, MR contacted Mr. Deneen by phone, text message, and email regarding his unpaid rent but was unable to obtain a response. On or about January 19,

2021, Douglas Spates, a principal of MR, checked on the Apartment and found a window open, lights on, two extra sleeping bags in the living room, and no one home. He contacted Mr. Deneen and was advised that April Gauthier was a person he could contact because Mr. Deneen was "trucking" which was an apparent reference to his work as a truck driver.

In February 2021, Ms. Gauthier contacted MR at least twice and advised she was forwarding Mr. Deneen's rent on his behalf. She did not do so. MR's call log business records for March 2, 2021 reflects the following entry memorializing information received from an occupant of another unit in the building:

> [J.S.] SAID THAT THE OLDER GENT (TOM) HAS BEEN GONE FOR A FEW WEEKS.
>
> APRIL IS THERE AND SHE MADE A COMMENT THAT SHE WAS NOT SUPPOSED TO BE THERE AND HAS A LOT OF TRAFFIC. HER BROTHER USED TO BE A CUSTOMER OF [J.S.] AND IS A HUGE HEROIN JUNKIE[.]

Gov't Ex. 3 at 00000278.

On March 18, 2021, call logs reveal that: "[Tenant in Unit B] CALLED TO LET US KNOW THAT THERE ARE PROBABLY SOME HOLES IN THE APARTMENT FROM APRIL[']S BROTHER THROWING A FIT[.]" *Id.* at 00000277-78.

On February 15, 2021, Mr. Deneen sent a text to MR indicating that the toilet in the Apartment needed to be fixed. MR sent a person to the Apartment to perform the repair who saw a mattress on the floor, a toilet clogged with paper towels, as well as a number of people who appeared to be living there. In response, in March 2021, Mr. Spates exchanged the following texts with Mr. Deneen:

> [**Mr. Spates**:] Tom[,] Pete just came back and said that that was plugged with paper towels please please please that cannot happen. Also what are you doing in regards to the rent[?]
>
> [**Mr. Deneen**:] I will tell them to stop that[.]
>
> [**Mr. Spates**:] Please because that was [] pretty expensive today. [Our] assumption is you are not living there but they are is that correct[?]
>
> [**Mr. Deneen**:] No I'm working but home 2 to 3 days[.]

3

[**Mr. Spates**:] Here's my concern[,] Tom[.] We rented to one person and that was you. What you might fail to understand is that we pay heat lights water sewer so everything's included based on one person. Very very understanding landlord but need to have a very understanding tenant. You have got yourself into a bad situation just not sure if you know that. How can we get this resolved[?]

[**Mr. Deneen**:] We are sending money soon[.]

[**Mr. Spates**:] That's the good news any idea when you will be sending it[?]

[**Mr. Deneen**:] There was a problem with a deposit[.]

[**Mr. Spates**:] Not sure what you mean by that[.]

[**Mr. Deneen**:] All the money we were expecting did [n]ot get deposited [s]o we have to track it down and then send it[.]

[**Mr. Spates**:] If you sent money that did not get deposited then yes you need to find out where it is[.] [W]as it a check or money order[?]

[**Mr. Deneen**:] Not to you I mean the money we were expecting[.]

[**Mr. Spates**:] OK you had mentioned to me Covid money and as I indicated to you there is no more Covid money and that ended first of January. If somebody is telling you they were expecting Covid money that is not true[.]

[**Mr. Deneen**:] I know[.]

[**Mr. Spates**:] Maybe when you have a minute give me a call and we can talk about this[.]

[**Mr. Deneen**:] Okay[.]

[**Mr. Spates**:] Tom I need a callback from you a serious situation [is] happening in YOUR apartment.

Hi Tom. It's rather apparent that you don't want to talk to me. Just so you know there is drug activity going on from your apartment. My fear is that when they find out this is your apartment you may be up a creek for delivering drugs back and forth from New Hampshire. I think my best suggestion was for you to ask for a lock change and get those people out of your apartment[.] [Y]ou are going down a very slippery slope and I think you're too nice a guy for that. They have hoodwinked you well!!!!

[**Mr. Deneen**:] I'm worki[n]g [D]oug[,] I'll be in touch[.]

[**Mr. Spates**:] I'll expect your call[.]

4

[**Mr. Deneen**:] Where are you hearing all this[?] April told me she was waiting to have knee surgery and then she was moving to another state[.] [W]here did all that come from[?]

[**Mr. Spates**:] She also said she sent out a check on Monday and that hasn't come. Building is presently being watched I can tell you that. And a very strong word is drug trafficking!!!!!! Presently on her record she has t[w]o [w]ri[ts] of possessions[.] Those are extremely serious charges as well as the fact she supposedly knows the law and screws people[.]

[**Mr. Deneen**:] Well I can't have that right now [I']m far away and working long hours[.] I'll get in touch with April [a]nd get rig[h]t back to you[.]

[**Mr. Spates**:] I would appreciate it[.] [J]ust get her to leave. No fun having your pay attached.

[**Mr. Deneen**:] Please don't threaten me. I'll call her[.]

[**Mr. Spates**:] I'm not threatening you but I will turn over every stone to make sure we get whole. This has been a screw job since the day you moved her in there. Your lease is very clear it's for one person you. Like I said I think you're a nice guy you've been screwed[.]

[**Mr. Deneen**:] Sounds like threatening to me[.]

[**Mr. Spates**:] Nope promising. Why don't you make it simple and get her out of there.

[**Mr. Deneen**:] As I explaine[d] to you Reinhardt promised me a job they didn't have[.] I will call April and see what's goin[g] on[.] Not threatening promising that a baby talk I'm busy[.]

[**Mr. Spates**:] But you are not living there?

[**Mr. Deneen**:] Yes I am[.]

Gov't Ex. 4 at 00000289-300.

Thereafter, as the two men continued to exchange text messages, Mr. Deneen told Mr. Spates that he and Ms. Gauthier were getting COVID rental assistance and that she was his wife. Mr. Spates, in turn, persisted in stating that Ms. Gauthier had lied about paying rent, Ms. Gauthier needed to leave the Apartment, Mr. Deneen should take the Apartment back, and MR would change the locks. At no time did Mr. Deneen seek to obtain approval for another person to reside in the Apartment.

In March 2021, Elia Spates, a manager at MR, saw Ms. Gauthier and a young man at the Center Street apartment building. Ms. Gauthier told Ms. Spates that she was going

to visit someone upstairs and Ms. Spates barred her entry into the building and told her there was no need for them to enter it. Ms. Gauthier and the young man got into a vehicle and left. During this same month, MR attempted to serve Mr. Deneen with eviction papers. A deputy sheriff went to the Apartment and encountered Mr. Deneen's "girlfriend" who refused to accept the papers on Mr. Deneen's behalf. MR's records indicated that the deputy sheriff reported that he "CANNOT SERVE THE GIRLFRIEND, ONLY TOM [DENEEN]. MAY HAVE TO DO A TACK ORDER IF [THE DEPUTY SHERIFF] CANNOT GET HIM SERVED IN THE NEXT WEEK." Gov't Ex. 3 at 00000278. The following day, Mr. Deneen promised to make a rent payment by March 19 and weekly payments thereafter. He did not do so.

In April and May of 2021, MR posted notices on the Apartment's front door notifying Mr. Deneen that he was in breach of the Lease for allowing other persons to reside there without written approval and providing him with notice to vacate the Apartment in thirty (30) days unless he met with the landlord and explained the reason for his default. MR received no responses to these notices.

In early May, Mr. Spates told Mr. Deneen that "We are going down there to change locks just wanna make sure she has gone[,]" to which Mr. Deneen replied, "April is still there[.]" Gov't Ex. 4 at 00000306. Mr. Spates urged Mr. Deneen to "escort her out of your apartment, and we will change the locks" and "you need to just encourage her to be gone" and "[c]an you help me move forward on this to get her out[?]" *Id.* at 00000307-10.

On May 24, 2021, Mr. Deneen advised Mr. Spates by text message that he would contact Ms. Gauthier and she could get back rent for the Apartment "if apartment was in her name[.]" *Id.* at 00000311. Mr. Spates responded on June 3, 2021 that MR was "not interested in renting to her" and that Mr. Deneen was "still responsible for the rent in damages" and that "[t]here is absolutely drug dealing[]s going on from her apartment." *Id.* at 00000312. Mr. Deneen responded: "I left there a long time ago[.] I don't know what arrangement you and April made work that out with her[.]" Id. at 00000312-13. Mr. Spates told Mr. Deneen that "that's not the way it works and you know that. If you had

done what I asked and made sure she was gone we wouldn't be in this situation. You are still very much responsible for that apartment[.]" *Id.* at 00000313. Mr. Deneen responded: "Good luck with that[.]" *Id.*

### C. MR Asks Law Enforcement to Remove Ms. Gauthier.

After Mr. Deneen confirmed that he vacated the Apartment, MR contacted Chief Harris to remove April Gauthier from the Apartment. In making this request, MR consented to law enforcement's entry and advised Chief Harris that people in the Apartment were not supposed to be there, were not tenants, and had been asked to leave but refused to do so. Ms. Spates further advised that when Mr. Deneen vacated the Apartment, a woman had moved in on her own. Based on these communications, Chief Harris credibly testified that he believed that the people inside the Apartment were squatters with no lawful right to occupy the Apartment. He also credibly testified that, based upon previous citizen complaints to LPD,[1] the occupants were engaged in drug trafficking activity.

On June 26, 2021, Chief Harris knocked on the door of the Apartment and ordered the occupants to open it. Sounds inside the Apartment suggested there was more than one person inside. Ms. Gauthier opened the door to the Apartment and Chief Harris and two other LPD officers entered. Chief Harris repeatedly told the people inside to get out because this was not their apartment. Inside, Brandon Sheltra began to gather his belongings. Chief Harris told Ms. Gauthier that she was a squatter and she responded that she was living there with Mr. Deneen. Chief Harris and LPD officers performed a protective sweep of the Apartment for officer safety to ensure there was no one else inside who might be armed. They found Defendant in a bed in the Apartment in a room with drug paraphernalia. When asked, Defendant stated his name was Luis Gonzalez.

---

[1] Defendant points to the prior complaints as notice that Ms. Gauthier claimed to live at the Apartment. There is no dispute that she did so. The issue is whether she reasonably believed she had an expectation of privacy in the Apartment.

Law enforcement found what appeared to be narcotics in plain sight. Chief Harris opened drawers and searched inside Ms. Gauthier's purse without her consent. No contraband was found in either the drawers or in Ms. Gauthier's purse.

Law enforcement detained the Apartment's occupants and called the Vermont State Police which sought and obtained a state court search warrant for the Apartment. While Defendant was in handcuffs, he was asked by a Vermont State Police trooper whether he had lied about his name and was advised that that he should not do so because if he lied, he would be "jammed up." LPD officers interjected that the name Luis Gonzalez did not show up their police databases. Defendant asked to speak to the Vermont State Police trooper and was told to wait until he was moved out of the Apartment. Approximately forty minutes later, Defendant was moved to an LPD cruiser and was told by an LPD officer that accurate information was needed for booking. The officer asked if Defendant's name was actually Luis Gonzalez. Defendant responded "no." Approximately ten minutes later, in the parking lot of the LPD station, Defendant asked the officer to write down his name: Addiel Santini. Defendant apologized for providing a false name and the officer thanked him for providing his real name.

### D. Statements by Mr. Deneen and Ms. Gauthier.

Neither Mr. Deneen nor Ms. Gauthier testified at the court's evidentiary hearing and thus neither was subject to cross-examination. Defendant submitted an affidavit from Mr. Deneen dated November 8, 2021 in which he averred that "a friend named April Gauthier" "moved her belongings into the apartment the same time that [he] did, in November of 2020." Def. Ex. J at ¶¶ 3-4. He "moved out of the [A]partment on Sunday, January 31, 2021" and "was upfront with [MR] that Ms. Gauthier had been living in the apartment and wanted to continue living there." *Id.* at ¶¶6-7. He avers that he told Mr. Spates by phone and text that MR could "work out a payment arrangement with Ms. Gauthier, who was a legitimate tenant of the apartment." *Id.* at 1 ¶ 8. He claims that MR accepted this arrangement by reaching out to Ms. Gauthier for the payment of rent and by confirming that Ms. Gauthier could not be evicted due to Vermont's moratorium on

evictions but would be served with eviction papers so that she could evicted once the moratorium was lifted.[2]

The court does not credit the statements in the Deneen Affidavit for the following reasons. First, Mr. Deneen made numerous false statements to Mr. Spates and MR regarding: whether he was living in the Apartment; who else was living there; his intention to pay rent; Ms. Gauthier's status as his wife, friend, or girlfriend; and whether and when he abandoned the Apartment. Indeed, virtually every communication he had with Mr. Spates and MR was false either in whole or in part.

Second, despite ample opportunity to do so, Mr. Deneen never expressed any belief to Mr. Spates or MR that Ms. Gauthier was a lawful tenant in the Apartment when he was asked to remove her from it. Instead, he stated she was in the process of moving out and suggested that MR enter into a separate arrangement with Ms. Gauthier and include her on the Lease. This step would not be necessary if he believed she was already a lawful tenant.

Third, Mr. Deneen is a sixty-two-year-old man who understood his obligation to pay rent and the consequences of his failure to do so as evidenced by his repeated promises that rental payments would be forthcoming. There is no evidence that he failed

---

[2] Vermont established a moratorium on ejectment actions during the COVID-19 state of emergency. *See* 2020 Vermont Laws No. 101 (S. 333). Although ejectment actions in general were automatically stayed until after the state of emergency was terminated, the law did not relieve tenants of the obligation to pay rent and permitted courts to "act in an emergency[,]" which "may include . . . illegal drug activity . . . that seriously threaten[s] the health and safety of other residents." *Id.* The moratorium addressed only the rights of "tenants[,]" which it fails to define. *Id.* The Vermont Superior Court, Addison Unit, ruled in a one paragraph Entry Order dated February 18, 2021 that an ejectment action against a non-tenant under 12 V.S.A. § 4853b was "subject to the moratorium" because the definition of ejectment in the moratorium "refers" to "the same chapters" of Vermont law that authorize ejectment of non-tenants. *See* Entry Regarding Motion, *Creekview Housing Limited Partnership v. Hollinger*, 21-cv-00292 (Vt. Super. Ct., Addison Unit) (Feb. 18, 2021) (Teachout, J.). The Vermont Superior Court held this "is consistent with the statutory purpose of [the moratorium] of preventing people from losing housing during the Covid-19 pandemic through court-issued writs of possession." *Id.* The events at issue in this case occurred in Caledonia County, not Addison County. The Entry Order does not appear to have been published. There is no evidence that MR, the Spates, or Chief Harris were aware of it.

to read and understand the three-page Lease which is in large font and in plain and ordinary language. *See Dep't of Corr. v. Matrix Health Sys., P.C.*, 2008 VT 32, ¶ 12, 183 Vt. 348, 352, 950 A.2d 1201, 1205 ("When the language of the contract is clear on its face, we will assume that the intent of the parties is embedded in its terms.") (alteration adopted) (internal quotation marks and citation omitted); *see also Gold v. Deutsche Aktiengesellschaft*, 365 F.3d 144, 149 (2d Cir. 2004) ("[I]n the absence of fraud or other wrongful act on the part of another contracting party, a party who signs or accepts a written contract is conclusively presumed to know its contents and to assent to them[.]") (alterations adopted) (internal quotation marks and citations omitted).

Finally, the Deneen Affidavit does not address evidence that Ms. Gauthier was not the only person residing in the Apartment. Mr. Deneen makes no claim that the other individuals who moved into the Apartment, including Defendant, were also lawful tenants.

For similar reasons, the court does not credit the statements Ms. Gauthier made to Defendant's counsel's investigator, Kevin Ridgely, when he interviewed her and asked her to sign an affidavit. In his interview, Mr. Ridgely told Ms. Gauthier he was attempting to establish that she had a reasonable expectation of privacy in the Apartment and that she believed that she could reside there as a lawful occupant. He asked her to sign an affidavit to this effect but she failed to do so. The court "cannot rely on the contents of an unsigned and unsworn affidavit[,]" *Meimaris v. Royce*, 2018 WL 9960113, at *2 (S.D.N.Y. Nov. 5, 2018) (collecting cases), which is "of no evidentiary value." *Grant v. Cornell Univ.*, 87 F. Supp. 2d 153, 161 (N.D.N.Y. 2000). The court also does not credit Ms. Gauthier's hearsay statements to Mr. Ridgely as there is no evidence that they are reliable. There is thus no evidence before the court that Ms. Gauthier believed she had a lawful right to occupy the Apartment for which she had not signed a lease, had not paid rent, and was repeatedly told to vacate.

## II. Conclusions of Law and Analysis.

### A. Whether the Fruits of the Search of the Apartment Must Be Suppressed.

> [I]n order to claim the protection of the Fourth Amendment, a defendant must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable; *i.e.*, one that has "a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society."

*Minnesota v. Carter*, 525 U.S. 83, 88 (1998) (quoting *Rakas v. Illinois*, 439 U.S. 128, 143-144, n.12 (1978)).

"The Fourth Amendment specifically provides that "the people" shall be secure against "unreasonable searches" in "their" houses, U.S. Const. amend. IV, but it has long been recognized that a person may claim a legitimate expectation of privacy in a dwelling other than his own." *Figueroa v. Mazza*, 825 F.3d 89, 108 (2d Cir. 2016). The Supreme Court has established that an "overnight guest can legitimately expect privacy in his host's home." *Id.* (internal quotation marks omitted) (citing *Minnesota v. Olson*, 495 U.S. 91, 98 (1990)).

> The Fourth Amendment looks with favor on "overnight guests" not because there is something talismanic about a person's intent to stay in a dwelling on a particular night, but because a host's willingness to take in a guest to sleep—slumber being a vulnerable state during which privacy is cherished—indicates that the guest has been accepted into the private sphere of the household.

*Id.* at 110 (citing *Carter*, 525 U.S. at 90; *Olson*, 495 U.S. at 99-100).

To determine whether a person is an overnight guest, the "ultimate inquiry" is "whether the host has so liberally shared his own privacy interest with his guest that it shelters the guest against unreasonable government intrusion." *Id.* at 109. "[A]ny guest, in appropriate circumstances, may have a legitimate expectation of privacy when he is there 'with the permission of his host, who is willing to share his house and his privacy with his guest.'" *United States v. Fields*, 113 F.3d 313, 321 (2d Cir. 1997) (quoting *Olson*, 495 U.S. at 99).

11

Defendant spent the night at the Apartment and was found by law enforcement sleeping in a bed. His alleged illegal activities in the Apartment do not render his expectation of privacy unreasonable. *See id.* ("We also reject the government's argument that the illegal nature of [defendant's] activities made any expectation of privacy regarding the premises unreasonable. Privacy expectations do not hinge on the nature of defendant's activities—innocent or criminal.") (citing *United States v. Taborda*, 635 F.2d 131, 138 n.10 (2d Cir. 1980)). There is no evidence that Mr. Deneen consented to Defendant's presence in the Apartment. Defendant, however, appeared to have Ms. Gauthier's consent to occupy it as an overnight guest. The court thus turns to whether Ms. Gauthier's expectation of privacy in the Apartment was reasonable such that it could be shared with Defendant. *See Figueroa*, 825 F.3d at 108.

The government argues that Mr. Deneen had abandoned the Apartment by his own admission and was no longer a lawful tenant at the time of law enforcement's entry. It further contends that Ms. Gauthier was a trespasser with no reasonable expectation of privacy in the Apartment. Defendant counters that a person occupying a dwelling unit without right or permission from the owner or under a lease retains rights under Vermont law and thus can be deemed to have a reasonable expectation of privacy. In addition, he points out that both law enforcement and MR knew Ms. Gauthier was living in the Apartment with Mr. Deneen's apparent consent.

The court agrees that Mr. Deneen abandoned the Lease when he failed to pay rent and advised MR on June 3, 2021 that he had left the Apartment "a long time ago[.]" Gov't Ex. 4 at 00000312-13; *see also* 9 V.S.A. § 4462 ("A tenant has abandoned a dwelling unit if: (1) there are circumstances that would lead a reasonable person to believe that the dwelling unit is no longer occupied as a full-time residence; (2) rent is not current; and (3) the landlord has made reasonable efforts to ascertain the tenant's intentions."). In his affidavit, Mr. Deneen claims to have left the Apartment on January 31, 2021, over four months prior to law enforcement's entry. He possessed no legal right to sublease the Apartment and no authority to permit Ms. Gauthier to occupy it in his stead. His communications with MR reflect his repeated assurances that he would talk to

12

Ms. Gauthier and that she was moving out, as well as his knowledge that she was not on the Lease and a separate arrangement with MR would be necessary for her to become a tenant. Ms. Gauthier, in turn, told a tenant in the Center Street building that she should not be in the Apartment and she allowed Ms. Spates to bar her entry into it.

When a lease prohibits subleasing, Vermont law provides for an expedited ejectment action to evict a person occupying a dwelling unit without right or permission. *See* 9 V.S.A. § 4456b(a)(2);[3] 12 V.S.A. § 4853b.[4] It is not clear whether ejectment is the

---

[3] "If the terms of a written rental agreement prohibit subleasing the dwelling unit, the landlord or tenant may bring an action for ejectment pursuant to 12 V.S.A. §§ 4761 and 4853b against a person that is occupying the dwelling unit without right or permission. This subdivision (2) shall not be construed to limit the rights and remedies available to a landlord pursuant to this chapter." 9 V.S.A. § 4456b(a)(2).

[4] 12 V.S.A. § 4853b provides:

> (a)(1) In an action for ejectment, the landlord, the landlord's agent, or the tenant may file a motion for a judgment that the plaintiff is entitled to immediate possession of the premises on the grounds that the defendant is a person that is occupying a dwelling unit without right or permission and the written rental agreement for the dwelling unit prohibits subleasing pursuant to 9 V.S.A. § 4456b(a)(2).
>
> (2) The motion may be filed and served with the complaint or at any time after the complaint has been filed. The motion shall be accompanied by an affidavit setting forth particular facts in support of the motion and a copy of the lease agreement.
>
> (b) A hearing on the motion shall be held any time after 10 days' notice to the parties.
>
> (c) At any time before the hearing, the defendant may oppose the motion pursuant to Rule 78(b) of the Vermont Rules of Civil Procedure by filing an affidavit, a signed written statement, or a memorandum in opposition to the motion. The affidavit, signed written statement, or memorandum shall set forth particular facts to show that a genuine dispute of fact exists in relation to the motion.
>
> (d)(1) If the defendant fails to appear for the hearing, or to file an affidavit, signed written statement, or memorandum in opposition to the plaintiff's motion, or has failed to file an answer in the time provided pursuant to Rule 12 of the Vermont Rules of Civil Procedure, the plaintiff shall be entitled to judgment by default for immediate possession of the premises.
>
> (2) If the court finds that the defendant is a person that is occupying the dwelling unit without right or permission and the written rental agreement for the dwelling unit prohibits subleasing pursuant to 9 V.S.A. § 4456b(a)(2), the court shall grant

sole remedy for an unauthorized occupant or whether he or she may also be removed by law enforcement as a criminal trespasser. *See* 13 V.S.A. §§ 3705(a)(1), (d).[5] The precise contours of Vermont law are immaterial because "federal law governs [a] federal criminal prosecution, including any questions relating to the lawfulness of the searches conducted." *United States v. Bethea*, 388 F. App'x 20, 21 n.2 (2d Cir. 2010) (citing *United States v. Rommy*, 506 F.3d 108, 129 (2d Cir. 2007)). State law is relevant only to the extent it provides "a source outside of the Fourth Amendment" that can render an expectation of privacy objectively reasonable. *Carter*, 525 U.S. at 88 (quoting *Rakas*, 439 U.S. at 143-44 n.12).

---

the plaintiff's motion and issue judgment in favor of the plaintiff for immediate possession of the premises.

(e) If the court issues judgment in favor of the plaintiff pursuant to subsection (d) of this section, the court shall, on the date judgment is entered, issue a writ of possession directing the sheriff of the county in which the property or a portion thereof is located to serve the writ upon the defendant and, not sooner than five days after the writ is served, to put the plaintiff into possession.

(f) At any time prior to the execution of the writ of possession, the defendant may file an affidavit, signed written statement, or a motion with the court setting forth facts demonstrating that the defendant is occupying the premises lawfully. The court shall treat an affidavit, signed written statement, or a motion filed under this subsection as a motion pursuant to Rule 59 or 60 of the Vermont Rules of Civil Procedure, as appropriate.

[5] 13 V.S.A. § 3705 states:

(a)(1) A person shall be imprisoned . . . or fined . . . if, without legal authority or the consent of the person in lawful possession, he or she enters or remains on any land or in any place as to which notice against trespass is given by:

(A) actual communication by the person in lawful possession or his or her agent or by a law enforcement officer acting on behalf of such person or his or her agent;

(B) signs or placards so designed and situated as to give reasonable notice[.]

. . .

(d) A person who enters a dwelling house, whether or not a person is actually present, knowing that he or she is not licensed or privileged to do so shall be imprisoned for not more than three years or fined not more than $2,000.00, or both.

14

Whatever procedural rights Vermont law confers on those occupying dwellings without right or permission, it does not convert unlawful occupancy into something "recognized and permitted by society" as reasonable. *Id.* Under federal law, "a mere trespasser has no Fourth Amendment protection in premises he occupies wrongfully." *United States v. Sanchez*, 635 F.2d 47, 64 (2d Cir. 1980); *see also Rakas*, 439 U.S. at 141 n.9 (holding that "by virtue of their wrongful presence" a person "cannot invoke the privacy of the premises searched"). Ms. Gauthier was an experienced renter who was not on the Lease, had not paid rent, and had been barred from the Apartment on at least one occasion. The arrival of a Deputy Sheriff with eviction papers, which she refused, and the notices posted on the Apartment door made it clear that her presence in the Apartment was not approved by MR. Against this backdrop, any expectation of privacy she had in the Apartment was not reasonable. She was a trespasser who kept her belongings in the Apartment and allowed guests to stay there at her peril.

Because Ms. Gauthier did not have a reasonable expectation of privacy in the Apartment, she could not share her expectation of privacy with Defendant as an overnight guest. *See Fields*, 113 F.3d at 321 (holding a person must have "a sufficient interest in the apartment to establish a legitimate expectation of privacy" in order "to share his privacy" with "guests . . . invited to the premises"). Defendant therefore did not have a reasonable expectation of privacy in the Apartment and lacks standing to challenge law enforcement's warrantless entry and search of it.

Assuming *arguendo* that Defendant could establish a reasonable expectation of privacy, the warrantless entry into the Apartment remained permissible because LPD officers reasonably relied on MR's consent to entry. "[A] warrantless entry and search are permissible if the authorities have obtained the voluntary consent of a person authorized to grant such consent." *United States v. Elliott*, 50 F.3d 180, 185 (2d Cir. 1995). "A landlord [has] authority to consent to a search by police of dwelling units in his building that are not leased." *Id.* at 186. Even if a landlord lacks "the authority to give a valid consent, official reliance on his consent may validate the search if it was reasonable for the officers to believe he had the requisite relationship." *Id.* (citing *Illinois v. Rodriguez*,

15

497 U.S. 177, 179 (1990)). This reliance "validates only searches that are based on a reasonable mistake as to the facts, not those based on an erroneous legal conclusion drawn from the known facts." *Id.* "Whether or not a given unit is unleased, however, is a question of fact." *Id.* at 187.

MR told Chief Harris that Mr. Deneen had vacated the Apartment and there was no lease agreement with Ms. Gauthier or others who had entered the Apartment after Mr. Deneen left. These claims were supported by MR's own investigations, including text messages with Mr. Deneen. Chief Harris reasonably relied on MR's representations of fact to make a warrantless entry into the Apartment. Although Vermont's moratorium provided certain protections against eviction, it did so only for "tenants," and Chief Harris had a reasonable factual and legal basis for concluding Ms. Gauthier was not a "tenant." The only authority to the contrary was a state trial court Entry Order from a different county that was not published.

The illegal narcotics found in the Apartment were in plain view, and their incriminating character was immediately apparent. *See Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993) ("[I]f police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant."). The court does not condone Chief Harris's warrantless search of Ms. Gauthier's purse, in which she retained an expectation of privacy. *See New Jersey v. T.L.O.*, 469 U.S. 325, 337-38 (1985) ("'[T]he Fourth Amendment provides protection to the owner of every container that conceals its contents from plain view'" and a search "of a closed purse or other bag carried on her person . . . is undoubtedly a severe violation of subjective expectations of privacy.") (quoting *United States v. Ross*, 456 U.S. 798, 822-823 (1982)). However, no evidence was found therein.

Because Defendant lacked a reasonable expectation of privacy in the Apartment and because the LPD reasonably relied on the consent of MR to enter the Apartment where they saw the illegal narcotics in plain view, Defendant's motion to suppress physical evidence must be DENIED.

### B. Whether Defendant's Pre-*Miranda* Warning Statements Should Be Suppressed.

Defendant argues that because he was "not afforded the appropriate *Miranda* warnings before his custodial interrogation, all his statements must be suppressed." (Doc. 27 at 8.) As the government notes, Defendant was provided *Miranda* warnings at the police station, signed a *Miranda* waiver, and participated in an interview. Without the benefit of *Miranda* warnings, however, Defendant, while still in bed in the Apartment, was asked his name and provided a false one. After he was detained, he was asked if he had provided a false name, admitted he had done so, and provided his real name.

The government represented at the hearing that that it does not intend to introduce Defendant's statements that Luis Gonzalez was not his real name. Defendant's motion to suppress those statements is therefore DENIED AS MOOT. The government opposes the suppression of Defendant's unwarned statement in the Apartment that his name was Luis Gonzalez.

The warning requirements of *Miranda* apply only to "'custodial interrogation.'" *United States v. Newton*, 369 F.3d 659, 669 (2d Cir.2004) (quoting *Miranda v. Arizona*, 384 U.S. 436, 444, 477 (1966)). To determine whether an individual is in custody, the Second Circuit "use[s] a two-step, objective test, that asks whether: (1) a reasonable person in the defendant's position would have understood that he or she was free to leave; and (2) there was a restraint of freedom of movement akin to that associated with a formal arrest." *United States v. Santillan*, 902 F.3d 49, 60 (2d Cir. 2018). Absent a formal arrest, "interrogation in the familiar surroundings of one's own home is generally not deemed custodial." *Newton*, 369 F.3d at 675.

When the LPD officers entered the Apartment, Defendant gave a false name while he was in bed, unhandcuffed, and free from any formal restraint. He was not held at gunpoint, physically touched, or threatened and, until the illegal narcotics were found, was affirmatively told not only that he could leave, but that he must. Considering the totality of the circumstances, Defendant was not subject to custodial interrogation at the

17

time he gave a false name, and no *Miranda* warnings were required.[6] Defendant's motion to suppress his statement made in the Apartment claiming his name was Luis Gonzalez is DENIED.

## CONCLUSION

For the foregoing reasons, Defendant's motion to suppress physical evidence and statements is DENIED. (Doc. 27.)

SO ORDERED.

Dated at Burlington, in the District of Vermont, this 25th day of February, 2022.

Christina Reiss, District Judge
United States District Court

---

[6] For this reason, the court does not address whether asking Defendant his name was permissible under the "routine booking question" exception to *Miranda* set forth in *Pennsylvania v. Muniz*, 496 U.S. 582 (1990).